UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:23-CR-123-SEG-JSA |
| | ) | |
| | ) | |
| ROYKELL HOLDER, | ) | |
| | ) | |
| Defendant. | ) | |

REPLY IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT

On January 6, 2023, Defendant Roykell Holder carried a handgun for the very reason that right is guarded by the Constitution—"for self-defense outside the home." *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ----, 142 S.Ct. 2111, 2122 (2022). Indeed, had he not been carrying a handgun that day, he would likely be dead.

The government has teed up a Hobson's Choice for those like Mr. Holder who, in a post-*Bruen* world, choose to exercise their constitutional and arguably *natural* right to protect themselves while still enjoying the presumption of innocence: Face harm, or face prison. But the Supreme Court has made it explicitly clear that if the Second Amendment is to mean anything, it must protect the right of ordinary citizens not to face that difficult choice. Self-defense

is the *central component* of the Second Amendment. *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767). And that includes the right to carry in public places, just as Mr. Holder did, because many like him "hazard greater danger outside the home than in it." *Id.* at 2135.

It is rare for the nonmoving party to carry the burden on a motion to dismiss. But when it comes to criminal allegations that implicate a defendant's Second Amendment right to protect himself, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In this case, the government has failed.

## ARGUMENT

The government is eager to stretch the limits of its power to fit these facts, as evidenced by its initial decision to indict Mr. Holder for a crime that does not even exist, possession of a firearm by pretrial defendant. (*See* Dkt. 1.) Indeed, 18 U.S.C. § 922(n) does not mention the word "possession" at all and is clearly not intended to cover mere possession, as the government now (properly) concedes. (*See* Dkt. 33 at 9.) Realizing its error, the government superseded and charged him again under the same statute, 18 U.S.C. § 922(n), but this time with *receipt* of

a firearm instead of possession.[1] Undersigned counsel is not aware of any circuit court that has analyzed the constitutionality of the statute at issue here—18 U.S.C. § 922(n)—after *Bruen*.[2]

Under *Bruen's* two-step test for deciding whether disarmament statutes are constitutional, this Court must determine whether Mr. Holder's charged conduct falls within the plain text of the Second Amendment as contemplated by the Founders. *See Bruen*, 142 S.Ct. at 2126. *Bruen* is not complicated, but it does require some historical excavation. If the defendant is among "the people" protected by the Second Amendment, the only question is whether the statute

---

[1] The original indictment charged Mr. Holder with possessing a firearm on January 6, 2023, because that is the date of the search warrant in which law enforcement found the firearm in his mother's home. (Dkt. 1.) When the government superseded to charge receipt, it charged the receipt as occurring on that same day—January 6, 2023. (Dkt. 14.) In truth, the government does not know when that firearm was "received" by anyone and whether—to the extent Mr. Holder even "received" it—he did so before or after he was charged in Gwinnett County. But Mr. Holder realizes that is a fact issue for trial, not for consideration on a motion to dismiss.

[2] There are circuit court opinions rejecting challenges on plain error review for those convictions sustained before *Bruen* and for which this argument was not preserved before the trial courts. *See, e.g., United States v. Avila*, No. 22-50088, 2022 WL 17832287, at *2 (5th Cir. Dec. 21, 2022) (holding that the historical analysis required under *Bruen* is appropriate on *de novo* review but not under a plain error standard); *United States v. Williams*, No. 22-10129, 2023 WL 2342341, at *1 (5th Cir. Mar. 3, 2023) (same). Because of the posture of those cases, they bear no weight here. And while several district courts have ruled on whether Section 922(n) violates the Second Amendment, they are roughly split on how they resolve the controversy. *See United States v. Adger*, No. CR 122-102, 2023 WL 3229933, at *3 (S.D. Ga. May 3, 2023).

restricting his gun use is consistent with our country's historical tradition of firearms regulation. There are two ways to answer that question: (1) If the statute addresses a problem that existed at the Founding that was also addressed then, it is likely constitutional; if the problem was not addressed then, it is likely unconstitutional. *See id.* at 2131. (2) If the problem the statute addresses new and unprecedented social issues or dramatic technological changes that could not have been contemplated at the Founding, we look for evidence of similar, analogous situations to see if the issue was regulated. *Id.* at 2132. For ease of reference, undersigned counsel created a decision tree below to simplify the *Bruen* analysis:



The government does not seem to dispute that Mr. Holder is among "the people" embraced by the Second Amendment and is therefore entitled to the presumption that his right to bear arms is protected. The government does not, for example, argue that Mr. Holder is outside the scope of Second Amendment because he is under indictment and is therefore not a "law-abiding" person.[3] Instead, it skips straight to the "historical analogues"/"relevantly similar" analysis that *Bruen* instructs courts to undertake only if they have concluded that the defendant is among "the people" and that the conduct targeted by the statute in question was not a societal concern at the time of the Founding. (*See* Dkt. 33 at 7-10.) The gist of the argument seems to argue that our historical tradition has long supported disarmament of groups deemed to be dangerous—even though our view of which groups actually are dangerous have evolved—so as long as the legislatures view individuals in the defendant's category as sufficiently dangerous, he is not protected by the Second Amendment.

One district court, on which the government heavily relies, upheld the statute's constitutionality by likening it to the same surety statutes referenced in

---

[3] This argument would not be availing even were it the government's claim. The term "law-abiding" exists nowhere in the plain text of the Second Amendment, nor has it been incorporated into binding precedent. While the Supreme Court used that adjective phrase in *Heller*, it was only used in dicta. *See District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). But even if binding precedent did establish that only "law abiding citizens" enjoy Second Amendment rights, Mr. Holder would not be excluded. He has not been convicted of any felony and enjoys the constitutional right to the presumption of innocence.

*Bruen* and relied on by the government here. *See United States v. Kays*, 624 F. Supp. 3d 1262, 1268 (W.D. Okla. 2022). Concluding that the statute only burdens the individual's Second Amendment rights while an indictment is pending, "a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or others," the court held the statute to be sufficiently narrow. *Id.*

But the *Kays* court did exactly what *Bruen* tells courts not to do—balance the concerns of safety and potential dangerousness of the person under indictment against the relative narrowness of the restriction. *Bruen*, 142 S.Ct. at 2127, 2129 (explicitly rejecting strict scrutiny review). Further, that court made the same mistake the government makes here, skipping straight to the "historical analogues" analysis under *Bruen* Step Two without first discussing *Bruen* Step One, whether Section 922(n) addresses a "general societal problem" that persisted in the 18th century but was not addressed. *See Bruen*, 142 S.Ct. at 2131.

Because Section 922(n) fails at *Bruen* Step One, this Court must dismiss that charge.

## I. The Statute at Issue—18 U.S.C. § 922(n)—Regulates a Societal Problem that Existed at the Founding but that Was Not Addressed.

The government glosses over *Bruen* Step One by claiming that pretrial bond was not really an issue that faced the Founders because felony indictees would have been detained. (Dkt. 33 at 5-6.) Mr. Holder directs the Court to the

Eighth Amendment: "Excessive bail shall not be required." U.S. Const. Amdt. VIII. Pretrial release was not only contemplated by the Founders, it was sufficiently important to address in the Bill of Rights.

The government then shifts to the red herring that the punishment for most serious felonies was death and that bond was not available for capital crimes. (*See* Dkt. 33 at 5-6.) Surely the government does not mean to imply that *all* felonies were capital offenses. Again, Mr. Holder directs the Court this time to the Fifth Amendment, which specifically distinguishes between capital and "infamous" crimes. U.S. Const., Amdt. V. In reality, very few felonies at the time of the Founding were punishable by death—mostly treason and murder. *See* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468 (2009) ("Within two decades of gaining independence from England, the states of the Union had replaced execution with incarceration for all but a few crimes."). Indeed, the Founders specifically adopted a belief—different from their British forbearers—that "criminal behavior was the result not of some innate and unchangeable defect in the criminal but of poor upbringing and a corrupting social environment" and that it could be reformed. *Id.*

For noncapital felonies, the Founders contemplated pretrial bond. *See* Kellen Funk and Sandra G. Mason, *Bail at the Founding,* Univ. of Penn. Public

Law and Legal Theory Research Paper Series No. 23-11, at 9 (rev'd Oct. 27, 2023) ("In its broadest sweep, the story of bail law, from its English origins to the constitutional provision enacted by nearly all states at the Founding the American states, is a story of continual efforts to restrict the power of the state to lock a person up before trial.") (attached as Ex. A). Roughly half of all states at the Founding pursued a model of criminal justice reform, based on Puritan and Quaker values, that "was significantly more protective of the liberty of accused persons" than what had previously existed. *Id.* at 10. This latter model "guaranteed release for all non-capital defendants who could procure solvent sureties to vouch for them." *Id.* For example, three years before the Constitution was ratified, Pennsylvania enacted a law lowering the punishment for certain felonies from capital punishment to terms of imprisonment and specifically contemplated bond for the accused. An Act Amending the Penal Laws of this State ch. 1241, p. 280-281 (1789) (providing that that bail could only be set by a judge of the supreme court) (attached as Ex. B).

Despite the government's unsupported claim, pretrial release for those indicted of felonies existed, and "general societal concern" of whether they should be allowed to obtain firearms would have similarly existed. The government did not cite to any statutes addressing firearm receipt by those on bond. The lack of regulation addressing this issue is "evidence that the public did

not approve of such a regulation." *United States v. Daniels*, 77 F.4th 337, 344 (5th Cir. 2023); *see also Bruen*, 142 S.Ct. at 2131 ([W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."). The statute at issue—Section 922(n)—was not enacted until approximately 180 years after the founding. *United States v. Adger*, No. CR 122-102, 2023 WL 3229933, at *2 (S.D. Ga. May 3, 2023).

If this Court concludes, as it should, that pretrial release existed at the time of the Founding and that the government failed to point to any regulations then existing that addressed the societal problem of disarming those under indictment, it need go no further. The Founders' failure to address that problem indicates that pretrial defendants were among "the people" intended to be protected by the Second Amendment, and Section 922(n) is unconstitutional.[4] That charge must be dismissed.

---

[4] The reasoning here also applies to the National Firearms Act charge in the indictment, 26 U.S.C. § 5861(d). Mr. Holder certainly acknowledges that there exists now firearms technology that could not have been contemplated at the founding, and that the search for historical analogues might be appropriate if he was accused of possessing a silencer, for example. But he is charged with having a short-barrel rifle, and there have surely been blacksmiths sawing off shotguns and rifles for as long as those firearms existed. There is nothing technologically advanced about hacking off the barrel of a rifle, so this is a problem the Founders could have addressed but did not.

II.    **The Government's "Historical Analogues" Analysis is Similarly Wanting.**

Because the question of firearms access for pretrial defendants on bond existed at the Founding but was not addressed, there is no need to look for "historical analogues" that are "relevantly similar" to Section 922(n). *See Bruen*, 142 S.Ct. at 2132. But even solely as a thought experiment, the government's position fails.

The government argues that "Founding-era legislatures categorically disarmed groups of people perceived to be dangerous or a threat to public safety, and based on reasoning that may or may not be proper today." (Dkt. 33 at 7.) Relying on an unpublished case from the Southern District of Georgia, the government claims that the historical view of the Second Amendment provides for limiting firearms access by those who pose "'heightened risks of criminality or dangerousness.'" (*Id.* at 8 (citing *Adger*, 2023 WL 3229933 at *4).) The government then references laws restricting gun ownership by groups such as Catholics, Quakers, Native Americans, and slaves. (*Id.* at 8-9.)

It is tempting to assume that, as a general proposition, the government can disarm those it deems dangerous. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (*abrogated by Bruen*) (Barrett, J., dissenting). The harder task is determining whether the Founders who authored and ratified the Second Amendment intended to empower Congress to disarm *anyone* it deems to be sufficiently

10

dangerous at some future point in history. *See Daniels*, 77 F.4th at 350. The Fifth

Circuit, in *Daniels*, noted that in debating the language of the Second

Amendment, the Framers specifically considered language limiting the right to

bear arms to "peaceable citizens" but rejected that language. *Id.* at 352. Instead,

the language was clear and unencumbered: "shall not be infringed." *Id.* So while

the government is correct that there were disarming statutes in existence in the

Founding era, they merely show that "Founding-era governments disarmed

groups they distrusted . . . [but] does nothing to prove that [the defendant] is

part of a similar group today. And any such analogy would be 'far too broad[ ].'"

*Range v. Att'y Gen. of U.S.*, 69 F.4th 96, 105 (3d Cir. 2023) (*en banc*) (quoting *Bruen*,

142 S.Ct. at 2134 (alteration in original)).

And while society's norms have (thankfully) evolved from labelling

specific groups as dangerous based on immutable demographic characteristics,

Section 922(n) is not analogous to those statutes because the group it targets—

those accused of committing serious crime—have always been considered

potentially dangerous and certainly could have been disarmed in the Founding

era along with all the groups targeted because of rank prejudice.  But they were

not.

Nor has the government proposed a workable standard for this Court to

use in determining whether those who have been accused but legally innocent

are sufficiently dangerous even if the Constitution allowed for strict scrutiny review—which it does not under *Bruen*. *See Daniels*, 77 F.4th at 342 ("[M]ore than just 'model citizen[s]' enjoy the right to bear arms.") (citing *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023)). Even if Congress is empowered to restrict firearm possession or acquisition by anyone it deems sufficiently dangerous, "[a]t what level of generality may we implement that principle?" *Id.* at 352-53.

The government's error early on in this case—indicting Mr. Holder for possessing a firearm and then superseding to charge receipt instead—is ironically probative of this issue. Even under the modern regulatory regime, Congress has not deemed pretrial defendants sufficiently dangerous to require complete disarmament. The law contemplates that such defendants, if on release, may be allowed to possess and even carry firearms. And nothing in the Bail Reform Act undermines this conclusion; disarmament is a condition of release that a magistrate judge may impose, but it is not mandatory. *See* 18 U.S.C. § 3142(c)(1)(B)(viii). There is not—even today—a statute the government can identify that supports the conclusion that pretrial defendants are excluded from *Bruen*'s consistent reference to "law-abiding, responsible citizens." And there is the paradox of the government's argument: on the one hand, pretrial defendants are so terribly dangerous that we can analogize Section 922(n) to Founding-era

statutes disarming other dangerous groups. But on the other hand, because pretrial defendants are not so dangerous that they require complete disarmament, the statute is "less burdensome" in that it just targets acquisition and not possession. (*See* Dkt. 33 at 9.) This smells suspiciously like the sort of strict scrutiny rationalization the Supreme Court now forbids. *See Bruen*, 142 S.Ct. at 2127.

Sitting *en banc*, the Third Circuit rejected the government's attempt to make this same argument. *Range*, 69 F.4th at 101-03. That court was grappling with the felon-in-possession statute but it took issue with the vagueness of the term "law-abiding" and whether it could be read to include anyone who committed summary offenses or misdemeanors. *Id.* at 98, 102. And even felonies, while more serious, "include a wide swath of crimes, some of which seem minor." *Id.* The label "felon," therefore, is meaningless when deciding what groups are sufficiently dangerous to warrant exclusion from the Second Amendment's ambit. *See id.* For this reason, the court was unwilling to give "extreme deference" to legislatures because it would give them "unreviewable power to manipulate the Second Amendment by choosing a label. *Id.* at 103 (citation and quotation marks omitted).

The government's attempt to analogize to surety statutes also fails. Indeed, these laws were prohibitive like Section 922(n) altogether, and they tended to

target only those threatening harm in the future. *See Bruen*, 142 S.Ct. at 2148-49

(discussing why surety laws are not analogous to general bans). And the

accused could often avoid paying the surety by showing a special need to

continue to carry a firearm; in no circumstance was he prohibited from carrying

(or presumably procuring) firearms. *See id.* Section 922(n), by contrast, sweeps

much more broadly than surety laws because it captures everyone under

indictment without any particularized showing[5] that a person poses an ongoing

threat, and it does not allow him to demonstrate that he has a need to acquire a

firearm.

Even if this Court needed to consider the government's Step Two historical

analogues, it has failed to offer up any Founding-era statutes sufficiently similar

to Section 922(n) that we can feel comfortable knowing the Founders would have

---

[5] The government states that "Section 922(n) burdens an individual's Second Amendment rights only after a specific showing of reasonable cause to fear an injury or breach of people during the pendency of an indictment." (Dkt. 33 at 13.) This is false, and the cited authority does not support that proposition either. The *Kays* court, cited by the government, suggests broadly that the pendency of an indictment is a "volatile" period that could potentially motivate a defendant to do violence, but that is not the same as a specific showing of credible dangerousness. *See United States v. Kays*, 624 F. Supp. 3d 1262, 1268 (W.D. Okla. 2022). There is no element of Section 922(n) that requires the government to show that the defendant poses a specific threat, and no "specific showing" need be made before a person can be charged with Section 922(n). If the individual is under indictment and acquires a gun, no further showing need be made. It is for this reason that Section 922(n) is qualitatively different from surety statutes; no particularized findings of dangerousness need be made.

intended the Second Amendment to exclude the charged conduct. This Court should dismiss that charge.

## CONCLUSION

It takes courage to advance the law beyond our comfortable paradigms, but that is the hard work courts must now do after the Supreme Court's sweeping embrace of a Second Amendment theory that extends beyond the narrow goal of preserving a well-regulated militia. Granting Mr. Holder's motion to dismiss may be an unsatisfying result, as reasonable minds can disagree with the Supreme Court's textual analysis and conclusion in *Bruen.* But it has spoken clearly and we must accept its wisdom. *Cf. United States v. Price*, 635 F. Supp. 3d 455, 460-61 (S.D.W.Va. 2022) ("Any modern regulation that does not comport with the historical understanding of the right is to be deemed unconstitutional, regardless of how desirable or important that regulation may be in our modern society.").

Because the government failed to carry its burden under *Bruen*, this Court must dismiss the Section 922(n) charge because it violates Mr. Holder's Second Amendment right.

Respectfully submitted this 20th day of November, 2023.

By:/s/     *Lynsey M. Barron*

Lynsey M. Barron,
  Ga. Bar No. 661005
BARRON LAW, LLC
1800 Peachtree St. NE, Ste. 300
Atlanta, Georgia 30309
Telephone (404) 276-3261
Email:  lynsey@barron.law

*Attorney for Roykell Holder*

16

## CERTIFICATE OF SERVICE

I hereby certify that on the below date I electronically filed the foregoing Reply in Support of Defendant's Motion to Dismiss with the Clerk of Court using CM/ECF system which will automatically send email notification of such filing to the to the following attorneys of record.

This 20th day of November, 2023.

/s/ *Lynsey M. Barron*
By: Lynsey M. Barron
Ga. Bar No. 661005

*Attorney for Roykell Holder*