IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA,      :

v.                           :   CASE NUMBER:

ROYKELL HOLDER,          :   1:23-CR-123-SEG-JSA

Defendant.      :

**REPORT AND RECOMMENDATION ON A MOTION TO DISMISS**

Defendant is charged with receiving a firearm while under indictment in violation of 18 U.S.C. § 922(n) and with possession of an unregistered firearm required to be registered in violation of 26 U.S.C. § 5861. Defendant moves to dismiss the Indictment on grounds that these criminal firearms prohibitions are unconstitutional as applied to him under the Second Amendment's right to keep and bear arms. For the reasons explained below, the Court **RECOMMENDS** that the Motion to Dismiss [29] be **DENIED**.

**I.     DISCUSSION**

**A.     *Assessing The Constitutionality of Firearms Regulations***

After *District of Columbia v. Heller*, 554 U.S. 570, 606-19, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Eleventh Circuit initially determined the constitutionality of gun regulations by (1) asking whether the Second Amendment

protected the conduct that the government sought to restrict; and (2) if so, applying

"the appropriate level of means-end scrutiny." *Nat'l Rifle Ass'n v. Bondi,* 61 F.4th

1317, 1321 (11th Cir. Mar. 9, 2023). The Supreme Court, however, subsequently

readdressed the Second Amendment test, in *N.Y. State Rifle & Pistol Ass'n v.*

*Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L.Ed.2d 387 (2022), and determined that

the lower courts, including the Eleventh Circuit, had been misapplying *Heller* by

relying on any "means-end" scrutiny.

   Pursuant to *Bruen*, when the Second Amendment covers a defendant and his

conduct, "the burden shifts to the government to demonstrate that its regulation 'is

consistent with the Nation's historical tradition of firearm regulation'" particularly

at or before the ratification of the Second Amendment in 1791. *Bondi*, 61 F.4th at

1321 (*quoting Bruen*, 142 S. Ct. at 2130, 1234). If the Second Amendment applies

and the regulation is not consistent with this historical tradition, the regulation is

simply unconstitutional without any further consideration.

   As *Bruen* instructs, "when a challenged regulation addresses a general

societal problem that has persisted since the 18th century, the lack of a distinctly

similar historical regulation addressing that problem is relevant evidence that the

challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131.

However, cases "implicating unprecedented societal concerns or dramatic

technological changes may require a more nuanced approach" because "[t]he

regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 . . . ."  *Id.* at 2132. "When confronting such present-day firearm regulations, th[e] historical inquiry that courts must conduct will often involve reasoning by analogy," which the Supreme Court reassures us is "a commonplace task for any lawyer or judge." *Id.*

### B.    *18 U.S.C. § 922(n)*

Defendant is charged, in Count Two, with a violation of 18 U.S.C. § 922(n), which prohibits the receipt of a firearm by a person under indictment for a felony. The Government does not argue that the Defendant and his conduct are outside the coverage of the Second Amendment, and thus the burden shifts to the Government to show § 922(n) is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.[1]

In the limited time since *Bruen*, the Eleventh Circuit has not weighed in on the constitutionality of § 922(n). The district courts that have addressed the issue

---

[1] At least one district court has questioned whether the Second Amendment applies to the receipt of firearms by indicted persons, as the Amendment only covers the right to "keep and bear arms," and § 922(n)'s restriction against "receiving" does not prohibit any persons from "keeping" and bearing the firearms they already possessed. *See United States v. DoneyEyeglasses*, 2023 WL 6442145, *3 (D. Montana, October 3, 2023). As the Government does not assert this argument, however, the Court will not consider it and will proceed to the remaining prongs of the analysis.

have reached different answers. The Court thus must mainly look for itself at the underlying evidence.

Section 922(n) itself dates back only to the 20th Century, so clearly it is not part of the relevant pre-Second Amendment historical tradition by itself. The Government also does not argue that this regulation is "distinctly similar" to any regulation that existed during the pre-1791 timeframe. A relevant initial question, therefore, is whether this statute addresses a novel societal problem not specifically of concern at the time of the Second Amendment, or whether it instead addresses a "general societal problem that has persisted since the 18th century." *Bruen*, at 2131. According to *Bruen*, if similar problems existed back in 1791, the absence of regulation would be relevant to show that the modern regulation violates historical tradition.

The Government argues:

Contrary to defendant's conclusory assertion (Doc. 52 at 8), potential gun violence by felony indictees released on bond is not a general societal problem that preoccupied the Founders in 1791 because felony indictees would have likely been detained.  At the founding, "[c]apital punishment for felonies was ubiquitous" and "was the standard penalty for all serious crimes." Medina v. Whitaker, 913 F.3d 152, 158 (D.C. Cir. 2019) (cleaned up).  Capital crimes "included nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." Id.; see also Harmelin v. Michigan, 501 U.S. 957, 980–81 (1991) (opinion of Scalia, J.) (explaining how First Congress effectively rejected any doctrine of proportionality with respect to capital crimes); Furman v. Georgia, 408 U.S. 238, 335 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including

4

"idolatry," "blasphemy," "assault in sudden anger," "adultery,"
"perjury in a capital trial," and "rebellion").  Capital defendants were
excluded from bail and detained since the colonial days.  Sandra G.
Mayson, Dangerous Defendants, 127 Yale L.J. 490, 502 (2018);
United States v. Slye, No. 1:22-mj-144, 2022 WL 9728732, at *2
(W.D. Pa. Oct. 6, 2022) ("The precedent for denial of pretrial release
to those accused of serious crimes dates to the early days of the
Republic—indeed to English common law.").  The public safety
threat posed by pretrial indictees was therefore not a general societal
problem at the founding.  United States v. Rowson, No. 22 CR 310,
2023 WL 431037, at *24 (S.D.N.Y. Jan. 26, 2023).

[33] at 5-6.

The Defendant, in reply, disputes that felonies were generally all capital

crimes during the relevant period and cites authorities to suggest that release on

bail was available in many jurisdictions for such non-capital felonies. *See* [40] at 6-

8. Defendant cites a fascinating and well-researched law review paper analyzing

the pretrial detention and bail legal standards and practices in Philadelphia in the

colonial and early republican periods. *See id. (citing* Kellen Funk and Sandra G.

Mason, *Bail at the Founding*, Univ. of Penn. Public Law and Legal Theory

Research Paper Series No. 23-11, at 9 (rev'd Oct. 27, 2023) ("In its broadest

sweep, the story of bail law, from its English origins to the constitutional provision

enacted by nearly all states at the Founding the American states, is a story of

continual efforts to restrict the power of the state to lock a person up before trial.")[2]

---

[2] Interestingly, according to this article, the remedy for a Magistrate erroneously
detaining or releasing an arrestee in colonial times was to prosecute *the Magistrate*
for a misdemeanor. *See* [40-1] at 17. The undersigned likely speaks for all inferior

Defendant also points out that the Fifth Amendment distinguishes between "capital" and "otherwise infamous" crimes, suggesting that not all serious crimes were non-bailable capital offenses.

The Court has carefully reviewed these materials, the parties' other citations, and the cases discussing historical bond and detention practices. The Court concludes that it is an exaggeration or oversimplification to say that capital punishment and automatic detention for felonies was "ubiquitous" at the time of the Second Amendment. But the Court also concludes that the Government has adequately shown that pretrial release for felony crimes was so unlikely and uncommon that legislatures did not face a "general societal problem" regarding receipt of guns by indicted persons.

The Court finds most persuasive the comprehensive analysis offered by *United States v. Rowson*, 652 F.Supp.3d 436, 470 (S.D.N.Y. 2023), in finding that the "relative scarcity of non-detained felony indictees… likely explains the absence of a colonial-era statute like § 922(n) addressed specifically to pretrial indictees." *Rowson* acknowledges that the scope of capital cases and availability of bail was not uniform among the early colonies and other jurisdictions, but ultimately finds that "at the time the Second Amendment was ratified, bail was not

---

judges everywhere in expressing relief that this method of correcting legal error has been changed.

available for many crimes that were then treated as capital offenses but which

today would be treated as felonies within § 922(n)'s scope." As *Rowson* explains:

> Under English law through the time of ratification, bail generally was
> either unavailable for persons "clearly guilty or indicted" of certain
> violent crimes such as murder, or was discretionary for "thieves
> openly defamed and known; persons charged with other felonies ...
> [or] accessories to felony under the same want of reputation." See
> Meyer, Constitutionality of Pretrial Detention, at 1157 (citing 4
> Blackstone 298–99). A few colonies, such as Massachusetts,
> Pennsylvania, and New York, departed from English bail practices
> during the 17th century and required bail for non-capital offenses—
> although colonial New York's law specified that "person[s] taken in
> Execucon [sic] for debts" were not eligible for bail. Id. at 1162–63 &
> accompanying notes. Similarly, when the Continental Congress
> enacted the Northwest Territory Ordinance in 1787, it specified that
> "all persons shall be bailable unless for capital offences, where the
> proof shall be evident, or the presumption great." See An Ordinance
> for the Government of the Territory of the United States, North-West
> of the River Ohio, art. 2, 1787 (emphasis added), But even in such
> jurisdictions, the scope of capital offenses was far broader than today.
> For example, in colonial Massachusetts, persons who practiced
> witchcraft, a "son over 16 rebelling against his parents," or a "child
> over 16 years old cursing or smiting his parent" all had committed
> capital crimes. See Meyer, Constitutionality of Pretrial Detention, at
> 1162 n.133 (citing The Lawes and Libertyes Concerning the
> Inhabitants of the Massachusetts 5 (M. Farrand ed. 1648)).

*Id*.

Funk and Defendant's other cites are consistent with *Rowson*'s finding that

bail was at least theoretically available even for some serious offenses, in some

(but not all) major jurisdictions. According to Funk, colonial Pennsylvania in

particular embodied a "law of bail in the founding era [that] was highly protective

of pretrial liberty," and limited capital offenses for which bond was unavailable to

7

only first-degree murder. [40-1] at 7, 29. Pennsylvania was perhaps the most liberal in this regard, owing in part to its Quaker traditions, and to William Penn's personal trauma at having been arrested and detained for political and religious-based offense in England in the 1600s. *Id.* at 22-24.[3] But Pennsylvania does not appear to have been alone in voicing these ideals. *See Harmelin v. Michigan*, 501 U.S. 957, 980–81 (1991) (stating that while the first U.S. Congress did not recognize "proportionality" in sentencing, in that it included lower-level felonies such as forgery and theft of $50 as capital offenses, some progressive colonies, including New Hampshire, recognized that "'[n]o wise legislature…"will afix the same punishment to the crimes of theft, forgery and the like, which they do to those of murder and treason.'")

---

[3] Defendant also cites the 8th Amendment's prohibition on excessive bail, which shows that the Founding Fathers obviously contemplated that bail would be available in appropriate cases. This citation is less helpful, however, because by itself it does not shed light on the sort of cases and defendants for whom bail would have been available. Defendant also cites other authority for the proposition that "[w]ithin two decades of gaining independence from England, the states of the Union had replaced execution with incarceration for all but a few crimes." See [40] at 7 (*quoting* Will Tress, Unintended Collateral Consequences: Defining Felony in the Early American Republic, 57 Clev. St. L. Rev. 461, 468 (2009)). This proposition by itself does not specifically shed light on how common pretrial release may have been for crimes recently withdrawn from being capital crimes. Also, this statement only pertains to the quick pace of reforms after independence and does not specifically discuss the historical tradition that pre-dated this period. The Court finds these authorities to be less helpful than Funk, and the authorities cited and discussed in detail in *Rowson* and *Medina*.

However, according to *Rowson*, "even in such jurisdictions, the scope of capital offenses was far broader than today." 652 F.Supp.3d at 470. And, more fundamentally, Defendant's authorities acknowledge that even in the most progressive jurisdictions, including Pennsylvania, "[b]ail practice on the ground diverged sharply from the law on the books." [40-1] at 8-9. Many individuals theoretically eligible were never released because bonds required access to sureties—respected community members who would vouch for and guarantee that the arrestee would appear and/or "keep the peace." *Id*. at 31-32.[4] For a substantial portion of the population, such resources were unavailable and thus a theoretical possibility of bond was "illusory." *Id*. at 49. As a result of all these considerations, even in relatively progressive jurisdictions, it remained true that "the early states inherited a set of rules from English law that restricted access to bail quite narrowly," and most of the subsequent reforms departing from that tradition occurred during the period of the "growing republic," that is, after the ratification of the Second Amendment. *Id.* at 16.

All of the foregoing suggests that while pretrial release for at least some felonies was likely occasionally allowed as of 1791, it was significantly uncommon, or at least substantially more uncommon than today. Legislators at this

---

[4] Funk contrasts the early American reliance on "sureties" to the cash-system of bond that emerged in at least some jurisdictions in the American justice system in the 20th Century.

time therefore would not have been faced with a "general societal problem" of any remotely similar magnitude as faced at the time of the enactment of § 922(n), that is, of potential gun violence and threats of violence posed by those obtaining firearms while under felony indictment. The Court thus agrees with *Rowson*, *Medina*, and the Government, that the "relative scarcity of non-detained felony indictees … likely explain[s] the absence of a colonial-era statute like § 922(n) addressed specifically to pretrial indictees." *Rowson*, 652 F.Supp.3d at 470. In other words, this absence is not evidence that the § 922(n) violates historical beliefs as to the intended coverage of the Second Amendment.

In any event, the Court cannot just stop at the presence or absence of an equivalent statute on the books in 1791. Ultimately, the Government must show that this statute is "relevantly similar" to a historical firearms regulation. *Bruen*, 142 S.Ct. at 2132-33. This analysis includes finding (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," and (2) "whether that burden is comparably justified." *Id.* at 2133. The Government's burden is only to show a "well-established and representative historical *analogue*, not a historical *twin*." *Id*. (emphasis in original).

The Court again agrees with the Government's position as to the existence of relevant historical analogues to § 922(n). First, while mostly shameful, there is a "long line of statutes predating—and/or present at—the founding [that] disarmed

persons deemed inherently dangerous." *Rowson*, 652 F.Supp.3d at 465. As *Rowson*

helpfully details:

> For example, in 1662, the British Parliament authorized Lieutenants to "seize all arms in the custody or possession of any person" deemed "dangerous to the Peace of the Kingdom." Opp. at 30 (citing Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662)); see also Militia Act of 1662 ("[A]rms so seized may be restored to the owners again if the said Lieutenants or ... their deputies or any two or more of them shall so think fit."). During the ratification period, a "highly influential," Heller, 554 U.S. at 604, 128 S.Ct. 2783, proposal that circulated among delegates recognized that "people have a right to bear arms ... unless for crimes committed, or real danger of public injury," id. at 658, 128 S.Ct. 2783 (Stevens, J., dissenting) (emphasis added) (discussing "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents").
>
> There is also ample evidence of colonial and revolutionary-era laws that disarmed groups of people perceived as per se dangerous, on the basis of their religious, racial, and political identities. See, e.g., Adam Winkler, Gunfight: The Battle over the Right to Bear Arms in America 115–16 & accompanying notes (2013) (citing laws barring gun sales to Native Americans, due to fears of violence; free and enslaved Black or mixed-race persons, even where completely law-abiding, out of fear of revolution against white masters; and Catholics or Loyalists); Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 L. & Contemporary Probs. 55, 72 & nn.103–04 (2017) (citing examples of colonial and revolutionary era laws disarming those who expressed dangerous opinions or refused to swear loyalty to the new American government); see also Samuel Cornell, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506–07 (2004) (citing examples of laws disarming those who refused to swear loyalty oaths) ("The security of the community outweighed any right a person might have to possess a firearm."); see also Waters v. State, 1 Gill 302, 309 (Md. 1843) (stating that, because free Black persons were treated as a "dangerous population," "laws have been passed to ... make it unlawful for them to bear arms"). Both parties have collected examples of and/or authorities collecting such laws. See Mem., Ex. C

at 40–42 (state laws as to Native Americans), 83–87 (state laws as to slaves); Opp. at 33–34 (collecting examples and secondary authorities).

*Id*. at 465-466.

Of course, it should offend and embarrass us that our forebears equated race, nationality, religion and political viewpoint with dangerousness and eligibility to possess a gun. But these laws strongly show that the legislators at the time of the Second Amendment were used to denying firearms to categories of persons based on perceived danger. Similar to these and other historical analogues, Section 922(n) was enacted "to combat violence and promote public safety" by keeping new firearms out of the hands of "categories of potentially irresponsible people." *United States v. Laurent*, 861 F. Supp. 2d 71, 83–84 (E.D.N.Y. 2011).

The statute imposes at least a comparable, if not substantially lesser, burden on the right of armed self-defense as compared to these historical restrictions. Indeed, unlike these historical restrictions, § 922(n) does not restrict any person's right to ongoing possession of any firearm he or she may have already had. The statute, rather, only restricts a person facing a felony charge from *receiving* any new firearm they did not already have while that felony is pending. This lesser restriction is at least comparably justified given Congress's belief that persons facing felony prosecutions are at higher risk of committing or threatening to commit violent crimes against themselves, other victims, witnesses, or the officials

involved in the prosecution.  *See Rowson*, 652 F.Supp.3d at 470 ("[T]he period in which an indictment pends is 'a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or to others,' thereby reasonably giving rise to fear threats or violence.") (*quoting United States v. Kays*, 624 F.Supp. 3d 1262, 1267-68 (W.D. Okla. August 29, 2022) (internal quotations omitted))

The Government draws the Court's attention to a second set of potentially analogous historical restrictions, that is, so-called surety statutes. These commonplace statutes during the relevant historical period generally "required any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Bruen*, 142 S.Ct. at 2148.

The Court finds these statutes to be less analogous but still somewhat relevant. These statutes plainly burdened individuals' right to keep and bear arms based on their perceived danger. The extent of that burden was both more and less extensive than that imposed today by § 922(n), in different ways. On the one hand, the surety statutes did not require the categorical disarming of individuals likely to breach the peace, but rather imposed the more limited requirement that those individuals obtain a surety bond to retain their firearms, unless they could show a specific need for self-defense. On the other hand, the surety statutes apparently

applied even without any formal charge of a crime, and (unlike the more limited

scope of § 922(n)) applied even to the person's right to continue to possess the

guns he or she already owned. Moreover, the surety statutes contemplated the

detention of individuals who failed to obtain the necessary surety, which as the

Funk article discussed above explains was often practically unobtainable by large

segments of the population.

On balance, the Court finds that the surety statutes, while not as analogous

as the disarming statutes, imposed a roughly comparable burden and were

comparably justified to § 922(g). And they further show that, at the time of our

nation's founding, our legislatures regularly restricted the right to keep and bear

arms by persons or categories of persons based on perceptions of their

dangerousness. It follows that the Congress did not breach historical norms by

doing so with regard to indicted persons in the form of § 922(n).

Based on the above discussion, the Court finds that § 922(n) is not

unconstitutional as applied to Defendant as that the Motion to Dismiss should be

denied as to Count Two.

C.     *18 U.S.C. § 5861(d)*

Defendant is separately charged in Count One with illegal possession of an

unregistered short-barreled (commonly known as "sawed-off") rifle, i.e., one with

a barrel of less than 16 inches in length, in violation of 26 U.S.C. § 5861(d). *See*

*also* 26 U.S.C. §§ 5845(a); 5845(a)(3); 5845(c).[5] This statute makes it unlawful for

any person to receive or possess specific categories of especially dangerous and

unusual firearms without registration, including short-barreled shotguns, short-

barreled rifles, firearm silencers, destructive devices, and machineguns. *See id.*; *see*

*also* 26 U.S.C. § 5845(a).

Defendant's initial brief sought dismissal of this Count on the same grounds

and per the same conclusory legal standards as the § 922(n) charge. However, the

assessment of the constitutionality of § 5861(d) is substantially different. The

Supreme Court in *United States v. Miller*, 307 U.S. 174, 175-78 (1939), stated long

ago that the plain text of the Second Amendment does not guarantee a right to

possess a short-barreled gun, stating that "we cannot say that the Second

Amendment guarantees the right to keep and bear "an unregistered sawed-off

shotgun having a barrel of less that eighteen inches in length."  This holding has

not been expressly or implicitly overruled by *Heller* or *Bruen*. To the contrary,

*Heller* distinguished the regulation at issue in *Miller* from the one deemed to be

unconstitutional in *Heller*, because "the Second Amendment does not protect those

weapons not typically possessed by law-abiding citizens for lawful purposes, such

as short-barreled shotguns." *Heller*, 554 U.S. at 625. Indeed, the courts recognize

---

[5] According to the Indictment, the rifle possessed by Defendant had a barrel only
4.5 inches in length. *See* Indictment [1] at 1.

that "a long gun with a shortened barrel is both dangerous", because "its

concealability fosters its use in illicit activity," and "because of its heighted

capability to cause damage."  *United States v. Cox*, 906 F. 3d 1170, 1185 (10th Cir.

2018)

Thus, the Government argues that Defendant has not shown that § 5861(d)

flunks the initial question posed by *Heller* and *Bruen*, that is, does the regulation

cover conduct protected by the Second Amendment? The Court agrees with the

Government. Importantly, the Eleventh Circuit and several other courts have

already rejected challenges to the constitutionality of this restriction against

unregistered short-barreled and similar weapons, *citing Miller. See, e.g., United

States v. Wilson*, 979 F. 3d 889, 903 (11th Cir. 2020) (rejecting challenge to 26

U.S.C. §§ 5681(d) and 5871, prohibiting possession of an unregistered sawed-off

shotgun); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009); *United

States v. Grey*, No. 18-CR-00412-CAS-1, 2018 WL 4403979, at *13 (C.D. Cal.

Sept. 13, 2018) (holding that the registration requirement does not violate the

Second Amendment); *see also United States v. Miller*, 11 F. 4th 944, 955 (8th Cir.

2021) (rejecting challenge to NFA's prohibition of short-barreled shotguns).[6]

---

[6] These authorities pre-date *Bruen* but post-date *Heller*. The Court sees no basis
why *Bruen* would have led to different results in these cases and Defendant does
not argue otherwise. In any event, it is not the province of this inferior court to
declare otherwise controlling authority from a superior court (including *Wilson*) to
be no longer good law, until that superior court says so. As noted previously, in

The Defendant does not respond to the Government's argument and reliance on *Miller* and *Wilson*, et al., in his reply brief. The Court thus agrees with the Government and finds that § 5861(d) is constitutional, because the Second Amendment does cover the Defendant's alleged conduct here in possessing a short-barrel rifle.[7]

## II.    CONCLUSION

For the reasons discussed above, the Motion to Dismiss [29] should be **DENIED**.

---

less enlightened days, the undersigned might be personally prosecuted for overstepping bounds in such a way!

[7] Because the Second Amendment does not cover the Defendant's conduct as it relates to this Count, further historical and analogical reasoning is unnecessary. However, the Court also finds, in the alternative, if necessary, that a restriction against inherently-concealable and more dangerous weapons such as short-barreled rifles, was consistent with the nation's historical traditions. Statutes and court decisions from at least the 1800s reflected an ongoing comfort with restrictions against concealed dangerous weapons, as even *Bruen* acknowledges. *See Bruen*, 142 S. Ct. at 2150 ("the historical evidence from antebellum America" shows that "States could lawfully eliminate one kind of public carry - concealed carry - so long as they left open the option to carry openly."); *Robertson v. Baldwin*, 165 U.S. 275, 281-82(1897) (stating in dicta that "the right of the people to keep and bear arms is not infringed by laws prohibiting the carrying of concealed weapons"). That this attitude was prevalent during this time period is at least suggestive that the pre-Second Amendment viewpoint was similar, and Defendant does not argue otherwise.

IT IS SO RECOMMENDED this 19th day of January, 2024.


**JUSTIN S. ANAND**
**UNITED STATES MAGISTRATE JUDGE**